United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 9, 1998 Decided December 29, 1998

 No. 97-7162

 Robert Franklin, et al., 

 Appellees

 v.

 District of Columbia, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (94cv00511)

 James C. McKay, Jr., Assistant Corporation Counsel, ar-
gued the cause for appellant. With him on the briefs were 
John M. Ferren, Corporation Counsel, and Charles L. Reis-
chel, Deputy Corporation Counsel.

 Kenneth W. Brothers argued the cause for appellees. With 
him on the brief was Jonathan M. Smith. John J. Rosenthal 
entered an appearance.


 Before: Silberman, Henderson, and Randolph, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: Spanish-speaking prisoners in-
carcerated in the District of Columbia's eight correctional 
institutions brought a class action claiming violations of the 
First, Fifth, and Eighth Amendments to the Constitution, 
federal statutes (42 U.S.C. s 2000bb; 42 U.S.C. s 2000(d)), 
and local law. They alleged that some class members were 
deficient in the English language and that the District had 
failed to provide qualified interpreters to these inmates when 
they appeared at parole and disciplinary hearings and when 
they sought medical care. The district court ruled in favor of 
the prisoners on their Fifth and Eighth Amendment claims, 
and the District brought this appeal.

 I

 There are 9,000 inmates in the prisons of the District of 
Columbia. The inmates speak dozens of languages; mem-
bers of the prison staff are fluent in a total of forty-seven 
languages. Of the 188 Spanish-speaking prisoners within the 
plaintiff class,1 150 had only a limited proficiency in English. 
To meet the needs of these and other prisoners who had 
difficulty communicating or understanding English, the Dis-
trict hired Laura Colon in November 1991 as the "Limited 
English-Proficient Program" coordinator. Under her aegis, 
the Program provided comprehensive orientation, diagnostic, 
mental health, vocational and language training for "Limited 
English-Proficient" prisoners. At the time of trial, the Dis-
trict required such prisoners to attend "English as a Second 
Language" classes and offered twenty-seven other programs 
either conducted in Spanish or specifically tailored for the 
plaintiff class. The prison system also employed seventy-two 
Spanish-speaking employees, including two case managers, 

__________
 1 The district court certified a class consisting of "all inmates of 
Hispanic origin who are now or who will later be incarcerated in the 
D.C. Department of Corrections institutions." Order of Dec. 13, 
1995, at 19.

two psychologists, and one psychiatrist. If bilingual staff or 
interpreters were unavailable, District officials could use the 
AT&T "Language Line," a service providing certified transla-
tors in 140 languages.

 After a bench trial, the district court--on April 16, 1997--
dismissed most of the prisoners' claims but held that the 
District was violating the Fifth and Eighth Amendments. 
Three months later, on July 8, 1997, the court issued a 
sixteen-page injunctive order mandating sweeping changes in 
the way the District operates its prisons. The District then 
filed a motion to alter or amend the judgment and for a new 
trial. The court denied the motion and this appeal followed.

 II

 The first question concerns our appellate jurisdiction. On 
April 17, 1997, one day after the district court rendered its 
decision on liability, the clerk of the court entered the judg-
ment. The prisoners think this opened the thirty-day window 
for the District to file a notice of appeal, see Fed. R. App. P. 
4(a)(1). The District missed the deadline and, so the prison-
ers claim, we cannot hear the appeal insofar as it attacks the 
April decision finding the District in violation of the Fifth and 
Eighth Amendments.

 Our appellate jurisdiction extends to "final decisions" of 
district courts. 28 U.S.C. s 1291. A final decision is one that 
"ends the litigation on the merits and leaves nothing for the 
court to do but execute the judgment." Catlin v. United 
States, 324 U.S. 229, 233 (1945). In damage and injunction 
actions, a final judgment in a plaintiff's favor declares not 
only liability but also the consequences of liability--what, if 
anything, the defendants must do as a result. See Liberty 
Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 742 (1976); see also 
Gilda Marx, Inc. v. Wildwood Exercise, Inc., 85 F.3d 675, 677 
(D.C. Cir. 1996).

 The order entered on April 17 established the District's 
liability, but it granted no relief, it imposed no obligations on 
the District, it did not say, as final decisions in such cases 
must, "who is entitled to what from whom." Horn v. Trans-

con Lines, Inc., 898 F.2d 589, 591 (7th Cir. 1990). It there-
fore was not a final judgment subject to appeal. An order 
like the one entered in April, "adjudging liability but leaving 
the quantum of relief still to be determined has been a classic 
example of non-finality and non-appealability from the time of 
Chief Justice Marshall to our own." Taylor v. Board of 
Educ., 288 F.2d 600, 602 (2d Cir. 1961) (Friendly, J.).

 The antitrust case of Brown Shoe Co. v. United States, 370 
U.S. 294 (1962), does not, as the prisoners suppose, alter this 
analysis. The district court in Brown Shoe disposed of the 
entire complaint, passed on every prayer for relief, ordered 
full divestiture, and permanently enjoined the defendants 
from acquiring any interest in each other. See Brown Shoe 
Co., 370 U.S. at 308. The Supreme Court said: "The single 
provision of that judgment by which its finality may be 
questioned is the one requiring appellant to propose in the 
immediate future a plan for carrying into effect the court's 
order of divestiture." Id. That lone provision did not render 
the order nonfinal, the Court held, because the judgment had 
decided the consequences of liability--namely, full divestiture. 
See id. Here, by contrast, the April judgment did not 
address the consequences of the District's liability. In this 
respect it resembled the order in Liberty Mutual Insurance 
Co., an employment discrimination case in which plaintiffs 
received a favorable ruling on the issue of liability, but 
received none of the relief expressly sought in their com-
plaint. See 424 U.S. at 742. "They requested an injunction, 
but did not get one; they requested damages, but were not 
awarded any; they requested attorneys' fees, but received 
none." Id. Because--as in this case--the district court had 
not yet finally disposed of any of plaintiffs' prayers for relief, 
the Supreme Court held that the district court's order was 
not a final decision. See id.

 The general rule is that a party is entitled to a single 
appeal, to be deferred until final disposition of the case. See 
McLish v. Roff, 141 U.S. 661, 665-66 (1891); see also Catlin, 
324 U.S. at 234; Luxton v. North River Bridge Co., 147 U.S. 
337, 341 (1893); Digital Equip. Corp. v. Desktop Direct, Inc., 
511 U.S. 863, 868 (1994). To hold that defendants in injunc-
tion actions must immediately appeal orders finding only that 


they are liable would further erode the long-standing policy 
against piecemeal litigation. The final judgment rule is al-
ready riddled with exceptions: orders granting or denying 
preliminary injunctions may be taken up immediately; some 
collateral orders may be appealed; rulings on controlling 
issues of law may be certified for appeal; orders adjudicating 
the claims of fewer than all the parties may be appealable, if 
the district court acts pursuant to Rule 54(b), Fed. R. Civ. P.; 
and Congress has given the Supreme Court rulemaking au-
thority to allow other interlocutory appeals, 28 U.S.C. 
s 1292(e). There are good reasons why none of the recog-
nized "exceptions" fits the district court's April order. As 
here, courts often resolve questions of liability first and 
questions of relief later. To allow an initial appeal challeng-
ing the finding of liability followed by a second appeal chal-
lenging the relief would frequently transform one appellate 
case into two. Delays at the trial level would become com-
mon, as district courts awaited appellate decisions on liability. 
For their part, the courts of appeals would often need to 
master the same record twice, and render two opinions 
instead of one. See 15A Charles Alan Wright et al., Federal 
Practice and Procedure s 3907 (1992). Furthermore, if 
defendants had to wait until the remedy came down, they 
might decide not to appeal despite the earlier decisions 
holding them liable. The relief ordered may turn out to be 
nominal. The parties may settle. In these events, and 
others, forcing an appeal at the liability stage without waiting 
for the consequences of liability to become final would lead to 
unnecessary appellate litigation. For all these reasons, the 
April 17 order was not an appealable final decision of the 
district court.

 Still, the prisoners insist that the April order must be 
considered final and appealable because the district court 
issued it separately and the clerk of the court entered it on 
the docket, as Rules 58 and 79(a) of the Federal Rules of Civil 
Procedure required. While a properly entered separate judg-
ment is an indicia of finality, see Diamond v. McKenzie, 770 
F.2d 225, 229 n.9 (D.C. Cir. 1985), it is not conclusive. The 


district court in Liberty Mutual Insurance Co. described its 
liability order as a "final judgment," 424 U.S. at 741, yet the 
Supreme Court treated it as a non-appealable interlocutory 
order. When appellate jurisdiction is at stake, what matters 
is the appellate court's assessment of finality, not the district 
court's or the clerk's. A non-final order cannot be appealed 
even if the district court designates it a "final judgment" and 
the clerk of the court enters it as such on the civil docket.

 For purposes of our appellate jurisdiction under 28 U.S.C. 
s 1291, the final decision of the district court came down on 
July 8, 1997, not April 17. Only in the July 8 order did the 
district court set forth the terms of the injunction and there-
by instruct the District what steps to take. Within ten 
business days of July 8, the District moved to alter or amend 
the judgment or for a new trial. See Fed. R. Civ. P. 52(b), 59. 
This had the effect of tolling the time for filing a notice of 
appeal. See Fed. R. App. P. 4(a)(4); Derrington-Bey v. 
District of Columbia Dep't of Corrections, 39 F.3d 1224, 1225 
(D.C. Cir. 1994); United States v. Haynes, 158 F.3d 1327, 
1329-31 (D.C. Cir. 1998). On August 27, 1997, the district 
court denied the motion. Because the District noted its 
appeal 29 days later (on September 25), within the 30 days 
provided in Rule 4(a)(1), Fed. R. App. P., its appeal was timely 
and we have appellate jurisdiction to review not only the 
injunction but also the judgment finding the District liable for 
violating the Constitution.2 When "an appeal is taken from a 
truly final judgment that ends the litigation, earlier rulings 
generally can be reviewed." 15A Wright et al., supra, 
s 3905.1.

 The District's July 22 motion properly sought relief from 
the July 8 injunctive order. Rule 7(b)(1) requires that mo-
tions state with particularity the grounds therefore and the 

__________
 2 The outcome would not change if we viewed the July 8 order as 
not in compliance with the "separate document" requirement of 
Federal Rule of Civil Procedure 58. See Pack v. Burns Int'l Sec. 
Serv., 130 F.3d 1071, 1072 (D.C. Cir. 1997); Haynes, 158 F.3d at 
1329-31.


relief sought. See Fed. R. Civ. P. 7(b)(1). The prisoners 
argue that the District's July 22 motion for a new trial or to 
amend the judgment "was devoted solely to attacking the 
April 16 judgment" and, for this reason, could not have tolled 
the time for noting an appeal from the July 8 injunction 
order. There are three mistakes embodied in the prisoners' 
argument. First, they are wrong that the District's motion 
attacking the court's liability decision did not attack the 
injunction. The motion necessarily had that effect. Without 
liability there would be no basis for injunctive relief. Second, 
the prisoners neglect to mention that the District's motion 
expressly challenged the terms of the July 8 order. See July 
22 Motion at 1, 2. The motion took issue with specific 
findings contained only in the July 8 order. The District's 
30-page memorandum, filed with its motion, amplified the 
District's concerns about the nature of the injunction. The 
motions in Riley v. Northwestern Bell Tel. Co., 1 F.3d 725 
(8th Cir. 1993); and Martinez v. Trainor, 556 F.2d 818 (7th 
Cir. 1977), which the prisoners cite, were of a different sort. 
In both of those cases, appellants filed curt, one paragraph 
motions, which clearly failed to comply with Rule 7(b)(1). 
Third, even if the District's motion had attacked only the 
April liability finding, its motion still would have tolled the 
time for appealing from the final judgment--the judgment, 
that is, rendered on July 8. Under Rule 59(b) and (e), Fed. 
R. Civ. P., motions for new trials and motions to alter or 
amend the judgment "shall be filed no later than 10 days 
after entry of the judgment." The term "judgment" means 
an order or a decree "from which an appeal lies." Fed. R. 
Civ. P. 54(a); see Derrington-Bey, 39 F.3d at 1226. The 
District properly filed its Rule 59 motion after the final 
judgment came down. And when that judgment came down 
on July 8, the District could attack--indeed, could limit its 
attack--to the earlier non-final ruling of liability on which the 
injunction rested. A motion so limited, like a Rule 59 motion 
directed only at the nature of the relief, tolls the time for 
noting an appeal from the final judgment. See Derrington-
Bey, 39 F.3d at 1225-26.


 III

 On the merits,3 we will start with the portion of the district 
court's decision adjudging the District liable for violating the 
prisoners' Fifth Amendment due process rights. These viola-
tions are said to occur at hearings in which the District fails 
to provide official interpreters to Spanish-speaking prisoners 
who have limited ability in English.

 The Fifth Amendment states that no "person shall ... be 
deprived of life, liberty, or property, without due process of 
law...." When neither life nor property is involved, 
courts--speaking in a sort of shorthand--talk of the need to 
find a "liberty interest" before considering what process is 
due under the Fifth Amendment (or the Fourteenth Amend-
ment). See, e.g., Wolff v. McDonnell, 418 U.S. 539, 556-58 
(1974); see also Sandin v. Conner, 515 U.S. 472, 474 (1995). 
This is another way of saying that unless an individual is 
threatened with losing "liberty" within the Fifth Amend-
ment's meaning, it is of no constitutional moment whether the 
individual will receive "due process of law."

 Prisoners, of course, have already lost liberty by virtue of 
their confinement. For the Due Process Clause to govern 
state action against an inmate, more than the usual con-
straints of prison itself must be in the offing. The Supreme 
Court put it this way: for a liberty interest to exist, the state 
must be subjecting the prisoner to a "restraint" that "imposes 

__________
 3 The District seeks a new trial on the basis that the district court 
acted unreasonably and arbitrarily in limiting the District's trial 
time. Trial courts possess considerable discretion in this area. 
See, e.g., United States v. Tilghman, 134 F.3d 414, 416 (D.C. Cir. 
1998); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 
604, 609 (3d Cir. 1995). Although the court confined the District to 
fifteen hours of trial time, the prisoners--who carried the burden of 
proof--labored under the same constraint. Both sides received 
advance notice of the conditions and both sides received ample 
opportunity to submit evidence into the record before trial. We 
could order a new trial if the District suffered a substantial injus-
tice, Fed. R. Civ. P. 61, but this record will not sustain any such 
claim.

atypical and significant hardship" as compared with "the 
ordinary incidents of prison life." Sandin, 515 U.S. at 484. 
Only then may it be said that a prisoner is threatened with a 
loss of "liberty" within the Constitution's meaning. Sandin 
discarded the method of analysis employed in Hewitt v. 
Helms, 459 U.S. 460 (1983), which had made the existence of 
a prisoner's liberty interest--at least with respect to matters 
concerning the conditions of confinement and the manage-
ment of the prison--turn on whether statutes and regulations 
concerning the state's action contained mandatory or discre-
tionary directives. Our opinion in Ellis v. District of Colum-
bia, 84 F.3d 1413, 1417-20 (D.C. Cir. 1996), analyzed Sandin 
and related Supreme Court decisions, not with regard to 
prison management, but in the context of parole eligibility 
determinations. Ellis held that local Board of Parole regula-
tions governing parole determinations for District prisoners 
did not create a liberty interest. See 84 F.3d at 1420. Our 
earlier decision in Price v. Barry, 53 F.3d 369 (D.C. Cir. 
1995), held the same with respect to the local statute regard-
ing parole. And the Supreme Court held in Greenholtz v. 
Nebraska Penal Inmates, 442 U.S. 1, 9-11 (1979), that a 
liberty interest in parole cannot be derived from the Constitu-
tion itself.

 Without taking account of Ellis or Price, or of Greenholtz, 
the district court determined that although plaintiffs "may 
have no liberty interest in parole per se ... that is not to say 
that inmates can be deprived of a fair hearing once the 
District of Columbia determines that a hearing will be held." 
And to the district court, a "fair hearing" meant the prisoners 
must have official interpreters to help them understand the 
proceedings. On this reasoning the court ordered the Dis-
trict's Board of Parole to coordinate with the Department of 
Corrections, and implement a procedure for providing official 
interpreters at parole hearings for all Spanish-speaking pris-
oners who are deficient in English.

 Although the reasoning in the court's conclusions of law 
dealt only with parole eligibility hearings, the injunction 
issued several months later went considerably further. In a 
sweeping decree, the court ordered the District to provide 


interpreters at "all stages of the disciplinary, classification, 
housing, adjustment and parole hearing process," and to 
"implement a procedure to ensure" translation into Spanish of 
"documents ... related to due process hearings...." So far 
as we can tell, the "adjustment" "hearing process" refers to 
proceedings to decide whether discipline shall be imposed on 
an inmate. See D.C. Mun. Regs. tit. 28, s 508; Sandin, 515 
U.S. at 475. Exactly what the court had in mind by "classifi-
cation" hearings is less clear. In its legal analysis of the 
prisoners' due process claims, the court does not even men-
tion "classification" hearings. The court's factual findings 
discuss only a "preparole classification hearing." The injunc-
tion's coverage of "housing" decisions--which we take to 
mean judgments by prison officials about where a prisoner 
will be confined--also does not seem to flow from the court's 
legal analysis. The court's conclusions of law nowhere even 
mention the subject of prison housing.

 As best we can determine, the court included matters other 
than parole eligibility in its decree solely on the basis of its 
reasoning--quoted above--that regardless whether a prison-
er has a liberty interest, if the District decides to have a 
hearing dealing with these subjects the Due Process Clause 
governs the proceedings. We will discuss in a moment why 
this reasoning is mistaken, but first we must address ques-
tions of mootness and standing.

 A

 Before we heard argument, a new law took effect, transfer-
ring to the United States Parole Commission "the jurisdiction 
and authority of the Board of Parole of the District of 
Columbia to grant and deny parole, and to impose conditions 
upon an order of parole, in the case of any imprisoned felon 
who is eligible for parole or reparole under the District of 
Columbia Code." National Capital Revitalization and Self-
Government Improvement Act of 1997, Pub. L. No. 105-33, 
s 11231(a)(1), 111 Stat. 712, 745 (effective not later than one 
year after date of enactment, Aug. 5, 1997) ("Revitalization 
Act").


 Why neither of the parties, and why especially the District 
of Columbia never alerted us to this statute is beyond com-
prehension. The Revitalization Act ends this case so far as 
parole hearings for felons are concerned. It was the District, 
through its Board of Parole, that was allegedly depriving 
inmates of due process, and it was the District's responsibili-
ty, through the Board of Parole, to implement the court's 
directive that "interpreters and translated documents are 
provided at parole hearings." But according to the terms of 
the Revitalization Act, after August 1998 the Board of Parole 
no longer had jurisdiction to conduct parole eligibility hear-
ings for the District's felon inmates. The United States 
Parole Commission, which the Revitalization Act directed to 
start performing this function, was not a party to this case; 
there was no evidence about how it conducts proceedings; 
there was no finding that it violates due process; it is not 
subject to the injunction; and for all we know, its procedural 
guidelines differ from the Board of Parole's. In short, 
s 11231(a)(1) of the National Capital Revitalization and Self-
Government Improvement Act renders moot plaintiffs' claims 
concerning parole hearings before the local Board of Parole, 
at least with respect to class members imprisoned for felo-
nies. See, e.g., United States v. Munsingwear, Inc., 340 U.S. 
36 (1950).

 However, given the breadth of the certified class--"all 
inmates of Hispanic origin who are now or who will later be 
incarcerated in the D.C. Department of Corrections institu-
tions," see supra note 1--it is possible that some members of 
this class are or will be imprisoned for misdemeanors, that is, 
for committing offenses punishable by imprisonment for one 
year or less. See United States v. Budd, 23 F.3d 442, 447 
(D.C. Cir. 1994); Stephens v. United States, 271 F.2d 832, 833 
n.1 (D.C. Cir. 1959). This possibility raises two questions, one 
dealing with mootness and the other with standing.

 As to mootness, s 11231(a)(3) of the Revitalization Act 
directs the Superior Court of the District of Columbia--not 
the United States Parole Commission--to assume the "juris-
diction and authority of the Board of Parole of the District of 
Columbia to grant, deny, and revoke parole, and to impose 


and modify conditions of parole, with respect to misdemean-
ants." It is not, however, apparent when this transfer of 
jurisdiction is to occur. The Revitalization Act directs the 
Superior Court to take over on the date when the District of 
Columbia Offender Supervision, Defender, and Courts Ser-
vices Agency ("Agency") "is established under section 11233." 
Revitalization Act s 11231(a)(3). Section 11233 states that 
this Agency "is established within the executive branch of the 
Federal Government" and that it "shall assume[ ] its duties 
not less than one year or more than three years after the 
enactment of this Act" (August 5, 1997). Another provision of 
the Revitalization Act abolishes the Board of Parole on the 
date the Agency "is established under section 11233." Revi-
talization Act s 11231(b). Both events--transfer to the Supe-
rior Court and abolition of the Board of Parole--hold the 
potential for mooting claims concerning parole hearings be-
fore the Board of Parole for members of the class who are 
misdemeanants. But, it may be that neither event has yet 
occurred.

 The second question is, as we said, one of standing. In 
Lewis v. Casey, 518 U.S. 343, 357 (1996), the Court held that 
in order to establish standing, "named plaintiffs" in a class 
action claiming inadequacies in a prison system must prove 
that they have been personally injured; beyond the pleading 
stage, it is not enough that some other, unidentified member 
of the class suffered harm from the inadequacy. As this case 
now stands, it is not enough that some unidentified class 
members suffered or will suffer injuries stemming from the 
manner in which the Board of Parole conducts parole hear-
ings. If the Board of Parole is still functioning, its jurisdic-
tion is restricted to parole for misdemeanants. In order for 
plaintiffs to have constitutional standing to challenge how 
those hearings are conducted, there must be proof that a 
named member of the class: (1) was imprisoned for a misde-
meanor; (2) could not speak or understand English; (3) 
appeared before the Board of Parole seeking early release on 
parole; and (4) suffered harm because of the Board's failure 
to provide an interpreter. The district court made no find-
ings with respect to whether plaintiffs had established these 


essential elements of standing.4 We have therefore reviewed 
the trial record. See Humane Society v. Babbitt, 46 F.3d 93, 
96 (D.C. Cir. 1995). Five inmates gave live testimony. 
Franklin, 960 F. Supp. at 399. Of these, three were serving 
time for committing felonies (Lazo, Bonilla, Nunez); the 
remaining two (Sandoval, Mejia) offered no testimony about 
parole hearings.5 The district court also considered the 
depositions of ten other inmates who were members of the 
class. Id. at 399-400 n.5. Of these, eight were incarcerated 
for felonies (Ramos, Artola, Benavides, Grande, Maldanado, 
Lugo, Suazo, Vilche); one (Gaviria) said nothing about parole; 
and the remaining inmate (Redman) reads and writes both 
English and Spanish and serves as a librarian in the prison 
law library.6 Under Lewis, then, plaintiffs have not estab-
lished actual injury. See 518 U.S. at 358 (quoting Lujan v. 
Defenders of Wildlife, 504 U.S. 555, 561 (1992)). They failed 
to prove that a named member of the class was a misdemean-
ant who went before the Board of Parole and did not under-
stand the proceedings because of lack of proficiency in En-
glish.

 With respect to parole, therefore, the court's judgment 
must be vacated, for mootness with respect to felons seeking 
parole, and for lack of standing with respect to misdemean-
ants seeking parole.

__________
 4 The district court gave only one concrete example of a member 
of the plaintiff class who was allegedly harmed in the context of 
parole because of his inability to speak English. Franklin v. 
District of Columbia, 960 F. Supp. 394, 418-20 (D.D.C. 1997). The 
individual--Jos Ramos--apparently had been released by the time 
of the trial. Id. at 399-400 n.5. His deposition shows that he was 
imprisoned for committing a felony, not a misdemeanor. In any 
event his evidence dealt only with a "preparole" proceeding con-
ducted by prison officials at "Modular." Id. at 418. Modular was 
closed in November 1995, id. at 400 n.10; and the court found that 
"each institution uses different procedures in determining who will 
receive translation services." Id. at 420.

 5 It is not clear whether these two prisoners were convicted for 
felonies.

 6 It is uncertain whether Gaviria and Redman were felons.

 B

 As to the remaining portion of the judgment dealing with 
due process and hearings, we do not take issue with the 
proposition that when liberty interests are at stake, the Due 
Process Clause gives prisoners certain procedural rights, 
including the right to obtain an understanding of the proceed-
ings. See Wolff, 418 U.S. at 570; Henry J. Friendly, Some 
Kind of Hearing, 123 U. Pa. L. Rev. 1267, 1280-83 (1975). 
But are liberty interests at stake in housing determinations, 
in classification hearings, and in disciplinary proceedings? 
The district court never directly addressed the subject. If it 
had, the court would have learned from Sandin that, at least 
with respect to discipline, the answer depends on the nature 
of the discipline to which the prisoner may be subjected, and 
the sentence the prisoner is serving. See 515 U.S. at 485-87. 
For instance, the 30-day disciplinary segregation imposed on 
prisoner Conner, although "punitive," did not "present a 
dramatic departure from the basic conditions" of his particu-
lar sentence, and hence did not confer a liberty interest 
entitling him to the "procedural protections set forth in Wolff 
[, 418 U.S. at 566]." 515 U.S. at 485, 487. It follows from 
Sandin that treating all disciplinary hearings alike, as the 
district court did here, is improper. To repeat, whether a 
prisoner's "liberty" is threatened--that is, whether the Due 
Process Clause applies--depends on the discipline involved 
and nature of the prisoner's term of incarceration.

 As we have said, the district court seemed to think that 
although the Constitution did not necessarily require the 
District to hold disciplinary hearings, if the District does so, 
the Due Process Clause governs the proceedings. This is the 
equivalent of saying that District rules, regulations and guide-
lines, which contemplate hearings, create a due process liber-
ty interest. Sandin firmly rejected that methodology. See 
515 U.S. at 480-84; see also Ellis, 84 F.3d at 1417-18. After 
Sandin, there must be a prisoner- and discipline-specific 
inquiry. Yet nowhere in the district court's legal analysis or 
in its factual findings is there any indication that the court 
considered what sentences the plaintiffs were serving or what 
discipline they were facing. The court therefore could not 

have compared the severity of the disciplinary sanctions to 
which these plaintiffs were subjected with the "ordinary 
incidents" of any particular plaintiff's confinement. Sandin, 
515 U.S. at 484. In fact, a reading of the district court's 
liability opinion reveals not a single incident of a due process 
violation, let alone "widespread" violations warranting the 
sort of "systemwide relief" the court ordered. Lewis, 518 
U.S. at 359.7 Because the court's injunction required official 
interpreters and translations to be provided to all English 
deficient Spanish-speaking prisoners at all disciplinary and 
adjustment board hearings, it cannot stand.

 Much of what we have just written applies equally to the 
other nonparole hearings encompassed within the court's 
injunction. Housing determinations and classification deci-
sions8 do not give rise to liberty interests merely because the 

__________
 7 In its findings of fact the court discussed adjustment board 
hearings in which the inmates' attorney, who was fluent in Spanish 
and English, served as an interpreter for them; and a "preparole 
classification hearing" in which one inmate acted as an interpreter 
for another. The court seemed to suggest, although it did not 
outright say so, that the District violated the Due Process Clause 
because someone other than an official interpreter acted for these 
Spanish-speaking prisoners. This conclusion could be reached only 
if a liberty interest were at stake, an unwarranted assumption for 
the reasons we have given in the text. In addition, Wolff indicates 
that the practices the district court criticized are entirely consistent 
with due process. The Supreme Court stated that, to comport with 
due process, the state should allow an "illiterate" prisoner faced 
with a disciplinary hearing "to seek the aid of a fellow inmate" or 
"to have adequate substitute aid in the form of help from the staff 
or from a sufficiently competent inmate designated by the staff." 
418 U.S. at 570.

 8 As discussed in the text, housing determinations are judgments 
by prison officials about where a prisoner will be confined or 
whether to place a prisoner in protective custody or administrative 
segregation. See D.C. Mun. Regs. tit. 28, ss 520, 522. Classifica-
tion decisions involve judgments by prison officials concerning the 
custodial, program, treatment, and special needs of individual in-
mates. See District of Columbia Department of Corrections Case 
Management Manual at II-A-3.

District has afforded inmates some kind of hearing. Deci-
sions about where a prisoner should be confined, at what level 
of custody9 (maximum, close, medium, minimum, or communi-
ty) he should be classified, when he should be transferred and 
so forth are commonplace judgments in the "day-to-day man-
agement of prisons." Sandin, 515 U.S. at 482. Unless the 
prisoner is subjected to some extraordinary treatment, such 
as transfer to a mental hospital, see Vitek v. Jones, 445 U.S. 
480 (1980), the effect of those judgments on prisoners--that 
is, the restriction on their liberty--is the ordinary conse-
quence of confinement for committing a crime. The district 
court did not, and on this record, could not determine that 
Spanish-speaking prisoners are routinely subjected to greater 
restraints than other prisoners as a result of housing or 
classification proceedings. Indeed, the court identified no 
Spanish-speaking prisoner who even arguably could claim 
that he had, under the Sandin test, been deprived of his 
liberty as a result of such proceedings. No legal reasoning 
backs up the district court's order that the District must 
provide all Spanish-speaking prisoners who do not under-
stand English with an official interpreter at all stages of the 
housing and classification "process." And so we also must set 
aside this portion of the court's injunction.

 It is worth repeating that broad decrees rendered in the 
name of the Due Process Clause, decrees mandating what 
must occur no matter what the circumstances, represent the 
sort of judicial legislating we have rejected in the past. See 
Ellis, 84 F.3d at 1424. If the district court detected a due 
process violation in a particular hearing or hearings, the court 
should have identified the proceeding and provided the Dis-
trict with an opportunity to rectify the deficiency. See Lewis, 
518 U.S. at 356, 362-63; see also Inmates of Occoquan v. 
Barry, 844 F.2d 828, 843 (D.C. Cir. 1988). The District 
already has a policy in place to provide interpreters at 
housing, adjustment and classification hearings; if it follows 
the policy it is hard to see how there ever could be a due 

__________
 9 See District of Columbia Department of Corrections Depart-
ment Order No. 5010.7, at 3 (July 30, 1986).


process infraction of the sort the district court identified. See 
Ellis, 84 F.3d at 1424. The District also possesses other 
means likely sufficient to prevent a denial of due process in a 
particular hearing. Just as "jailhouse-lawyers" can provide 
constitutionally-sufficient access to the courts, see Lewis, 518 
U.S. at 360 n.7, bilingual lawyers, bilingual parole board 
members, and bilingual housing and adjustment board mem-
bers (there was one) can translate for Spanish-speaking pris-
oners so that they understand the proceedings. See supra 
note 7. That is in fact what often happened in the District's 
prisons when official interpreters were not available. At any 
rate, only if prison officials had abdicated their constitutional 
responsibilities could the kind of sweeping injunctive relief 
ordered by the district court be considered. See Inmates of 
Occoquan, 844 F.2d at 842. The moment has not arrived.

 IV

 The district court also ruled that the District had inflicted 
cruel and unusual punishment on the plaintiff class by failing 
to provide them with interpreters when they sought medical 
care.

 To establish a violation of the Eighth Amendment's cruel 
and unusual punishments clause, the prisoners had to prove 
"deliberate indifference" on the part of the prison authorities. 
See Scott v. District of Columbia, 139 F.3d 940, 942 (D.C. Cir. 
1998) (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)). 
That is, they had to show that the officials were "knowingly 
and unreasonably disregarding an objectively intolerable risk 
of harm" to the prisoners' health or safety. See id. at 943 
(quoting Farmer v. Brennan, 511 U.S. 825, 846 (1994)). The 
officials had to be "aware of facts from which the inference 
could be drawn that a substantial risk of serious harm exists, 
and ... must also draw the inference." See id. (quoting 
Farmer, 511 U.S. at 837).

 In a memorandum setting forth the procedures for obtain-
ing interpreters for Limited English-Proficient inmates, the 
District stated that it was "essential" that such inmates 
receive interpreter assistance during medical consultations. 

In order to provide prompt and reasonable access to inter-
preters, the District designated a bilingual coordinator for 
each facility, compiled a bilingual staff roster, and required 
that the roster be widely disseminated to the prison staff.

 The district court seemed to think that the District's failure 
to implement fully its policy concerning interpreters amount-
ed to "deliberate indifference." But we have said before that 
"it is hard to see how imperfect enforcement of a ... policy 
can, alone, satisfy Helling's subjective element. That the 
District even had such a policy militates against a finding of 
deliberate indifference." Scott, 139 F.3d at 944. For another 
thing, the prisoners here never established the requisite 
subjective state of mind for deliberate indifference. There 
was no proof that senior policymakers or other District 
officials intentionally deprived prisoners of access to medical 
care, see Estelle v. Gamble, 429 U.S. 97, 105 (1976), or 
willfully violated their duty of care, see Murphy v. United 
States, 653 F.2d 637, 644 (D.C. Cir. 1981), or that any 
particular member of the class suffered serious harm from 
inadequate medical care because of the prisoner's inability to 
communicate in English. At oral argument, when asked 
which District official displayed deliberate indifference to 
members of the plaintiff class, prisoners' counsel named 
Laura Colon.10 There is no legal basis for treating a program 
coordinator like Colon as the kind of senior policymaker 
whose state of mind can be taken as the District's. See 
Triplett v. District of Columbia, 108 F.3d 1450, 1453 (D.C. 
Cir. 1997). And the factual basis for the prisoners' accusa-
tion--that Colon refused to distribute some signs and pam-
phlets written in Spanish--borders on the frivolous. A tire-
less advocate on behalf of the prisoners, Colon led efforts to 
expand the resources the District made available to Spanish-
speaking inmates.

 Nor did the evidence establish that the District had acted 
with the "obduracy" and "wantonness" that mark deliberate 
indifference. See Scott, 139 F.3d at 944 (quoting Whitley v. 

__________
 10 The prisoners also named a case manager but failed to provide 
specifics.


Albers, 475 U.S. 312, 319 (1986)). The District operated 
twenty-seven different non-medical programs to assist 
Spanish-speaking inmates. It required Limited English- 
Proficient prisoners to attend "English as a Second Lan-
guage" classes six hours per day, five days per week. When 
deficits depleted the District's budget, the District shielded 
the Limited English-Proficient Program and the two bilin-
gual case managers from cutbacks. Shortly before trial, the 
District compiled a list of all Hispanic inmates, revised its 
master roster of bilingual employees, trained bilingual coordi-
nators, appointed health and mental health service coordina-
tors, designed and administered the language assessment 
test, and color coded medical charts regarding Hispanic in-
mates' language proficiency. Such efforts--stretching over 
the course of years--do not resemble cruel and unusual 
punishment.11

 The court's finding of Eighth Amendment violations--de-
spite this evidence of the District's good faith--is flawed in 
still other respects. The court said the District lacked ade-
quate bilingual staff. Yet the bilingual staffing in the Dis-
trict's prisons exceeded that of comparable prisons. The 
court found the District's resources for Spanish-speaking 
inmates to be "meager" and "deficient." Yet the court itself 
determined that "when compared to the percentage of His-
panics in the prison population, the [District] apportions a 
greater pro rata percentage of its resources ... for LEP 
[Limited English-Proficient] Hispanic inmates than it does 

__________
 11 Contrast Williams v. Vincent, 508 F.2d 541 (2d Cir. 1974) (cited 
in Estelle, 429 U.S. at 104 n.10), in which a doctor chose the "easier 
and less efficacious treatment" of throwing away the prisoner's ear 
and stitching the stump and which may be attributable to "deliber-
ate indifference ... rather than an exercise of professional judg-
ment." Or Thomas v. Pate, 493 F.2d 151 (7th Cir. 1974), in which a 
nurse injected a prisoner with penicillin knowing that the prisoner 
was allergic and then the doctor refused to treat the prisoner's 
allergic reaction. Or Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 
1970), a case in which a prison physician refused to administer a 
prescribed pain killer and performed unsuccessful leg surgery, 
requiring the prisoner to stand despite a surgeon's contrary instruc-
tions.

for other inmates." The court relied heavily on the testimony 
of non-medical staff. Yet the court essentially ignored the 
District's non-medical programs evincing a lack of indiffer-
ence.

 Because the prisoners failed to establish deliberate indiffer-
ence, we reverse the district court's decision insofar as it held 
that the Eighth Amendment compelled the District to provide 
interpreters whenever members of the plaintiff class seek 
medical care.

 V

 In a few lines of its liability opinion, the district court ruled 
that the District had violated the "prisoners' right to medical 
confidentiality." The court thought it "unjustified" for the 
District not to employ medical personnel who could translate 
because, without them, Spanish-speaking prisoners would 
have to disclose their medical conditions to correctional offi-
cials or other inmates who could interpret for them. To 
enforce this ruling, the court ordered, in part, the District to 
hire bilingual mental health care providers, to furnish bilin-
gual medical and dental health care providers or translations 
by a bilingual member of the health care staff "certified as 
fluent in the Spanish language," and not to use the AT&T 
Language Line absent a prisoner's knowing and voluntary 
waiver.

 The district court presumed that prisoners possess a limit-
ed constitutional right to medical confidentiality, a "right to 
privacy" that may not be infringed without some "valid 
penological justification." Exactly where in the Constitution 
this right is located the court did not say.12 One place might 
be the Fourth Amendment. But the Supreme Court has held 
that the expectation of privacy of those incarcerated is se-

__________
 12 "Courts do not"--should not--"adjudicate generalized claims of 
unconstitutionality, but rather resolve constitutional questions by 
applying these settled doctrines to specific constitutional claims 
asserted under specific constitutional clauses." Association of Bi-
tuminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1253 (D.C. Cir. 
1998).

verely diminished, so much so that a "right of privacy in 
traditional Fourth Amendment terms is fundamentally incom-
patible with the close and continual surveillance of inmates 
and their cells required to ensure institutional security and 
internal order." Hudson v. Palmer, 468 U.S. 517, 527-28 
(1984). Besides, we cannot understand how a prisoner's 
telling another, bilingual prisoner about his symptoms could 
amount to an unreasonable search or seizure by the District.

 Rather than the Fourth Amendment, the district court may 
have had the Eighth Amendment in mind. The court cited 
Anderson v. Romero, 72 F.3d 518, 523 (7th Cir. 1995), a case 
in which the Seventh Circuit could not "find any appellate 
holding that prisoners have a constitutional right to the 
confidentiality of their medical records," but stating in dictum 
that the Eighth Amendment might protect against a state's 
dissemination of "humiliating but penologically irrelevant de-
tails of a prisoner's medical history." Id. Anderson's dictum 
has nothing to do with this case. Here we have other 
inmates or correctional staff helping Hispanic prisoners re-
ceive medical treatment by translating for them. That is a 
far cry from "deliberate indifference" to the inmates' health 
or safety, a necessary element of an Eighth Amendment 
violation.

 When we look beyond the Fourth or Eighth Amendments, 
we still cannot see how a prisoner's right to medical confiden-
tiality can be derived from the Constitution. The prisoners, 
in their amended complaint, cited the Due Process Clause of 
the Fifth Amendment as the basis for this particular claim, 
although their brief on this subject mentions only the Eighth 
Amendment. See Appellees' Brief at 24. Focusing on the 
Fifth Amendment, one might contend that a prisoner retains 
"liberty" not to disclose his medical condition to correctional 
employees. For obvious reasons, plaintiffs make no such 
claim. Prisoners cannot obtain treatment except by revealing 
their medical history and symptoms to government employ-
ees. Indeed, the injunction issued here requires the District 
to hire more medical employees versed in Spanish and En-
glish in order to facilitate the receipt of medical information 
from these plaintiffs. And so the alleged due process "right" 


must be reformulated to fit plaintiffs' complaint, and when it 
is, its lack of foundation is exposed. It is a constitutional 
violation, according to the plaintiffs, if a Spanish-speaking 
prisoner has to seek help from a fellow inmate to translate his 
statements into English for the prison doctor. What plain-
tiffs actually advocate, therefore, is the creation of a constitu-
tional right for non-English speaking prisoners to disclose 
their medical condition only to certain government employ-
ees. This is an odd formulation: when recognized in the past, 
the constitutional right of privacy has protected against dis-
closure to the state.13 See, e.g., Whalen v. Roe, 429 U.S. 589, 
599, 602 (1977). Suppose plaintiffs prevailed, suppose mem-
bers of their class had a due process right to be treated by 
prison medical personnel who speak their native tongue. Such 
a constitutional right could hardly be reserved only for 
Spanish-speaking prisoners. Prisoners who spoke or under-
stood only Arabic, or only Mandarin or Italian or any other of 
the world's languages would presumably have the same con-
stitutional right when they sought medical treatment. Imple-
menting such a system would inevitably entail considerable 
disruption and expense, and might well prove to be impossible 
given the difficulty the District has experienced in recruiting 
medical staff. Would prison officials have to hire bilingual 
doctors even if their translating skills could be used for only a 
handful of prisoners? When the mix of languages among the 
prisoner population changed from time to time, would the 
Constitution require adjustments in the prison's medical staff-
ing? Would prison officials have to pass over more qualified 
physicians in the interest of hiring those who spoke several 
languages? Would bilingual medical staff have to be main-
tained around the clock? These and many other questions 

__________
 13 Odd though it may be, one district court summarily endorsed 
the concept: "Unless the person interpreting for purposes of medi-
cal care is bound to maintain the confidentiality of the information 
being exchanged, the inmate/patient's constitutional privacy right is 
violated." Clarkson v. Coughlin, 898 F. Supp. 1019, 1049 (S.D.N.Y.
1995). This elevates the evidentiary doctor-patient privilege and 
the ethical obligations of physicians to a constitutionally-required 
status. But see Whalen, 429 U.S. at 602.


would draw the federal courts into the day-to-day manage-
ment of prisons in a way the Supreme Court and our court 
have strongly set ourselves against. The District has a 
strong penological interest, indeed it has an obligation, to 
furnish adequate medical care to those confined under its 
authority. See Turner v. Safley, 482 U.S. 78, 89 (1987). 
Hiring more bilingual medical personnel might, or might not, 
enhance the provision of medical care in the District's prisons. 
Like all governments, the District has a limited budget; 
expenditures for one purpose diminish the resources available 
for others. The District believes that its current combination 
of bilingual coordinators, medical staff and the AT&T Lan-
guage Line satisfies its obligations to these prisoners in 
bridging the language barrier. In a disciplinary hearing in 
which an illiterate prisoner is threatened with a loss of his 
constitutional "liberty," the Supreme Court has said that the 
state fulfills its due process obligation when it allows another 
inmate or a member of the prison staff to assist the prisoner. 
Wolff, 418 U.S. at 570. We believe the same is true when the 
assistance relates to medical treatment rather than proceed-
ings of a legal nature. To put the matter in Sandin's terms, 
for inmates lacking proficiency in English, having other in-
mates or correctional employees translate for them when they 
seek medical care is "one of the ordinary incidents of prison 
life," 515 U.S. at 484; indeed, outside of prison it is doubtless 
an ordinary incident of everyday life for non-English speaking 
persons to receive help from others in order to communicate 
with their doctors.14 For these reasons, we hold that 
Spanish-speaking prisoners with limited proficiency in En-
glish do not have a privacy right, derived from the Constitu-
tion, to force the District to hire bilingual medical personnel 

__________
 14 As a general matter, "disclosures of private medical information 
to doctors, to hospital personnel, to insurance companies, and to 
public health agencies are often an essential part of modern medical 
practice even when the disclosure may reflect unfavorably on the 
character of the patient." Whalen, 429 U.S. at 602.


so that the prisoners may communicate their medical infor-
mation only to such employees.

 * * *

 Insofar as the judgment of the district court relates to 
parole hearings, the judgment is vacated as moot to the 
extent it concerns felons and vacated for lack of standing to 
the extent it concerns misdemeanants. The remaining por-
tion of the district court's order of July 8, 1997, is vacated and 
the court's liability judgment is reversed.

 So ordered.